No. 2267.

ERASMUS MAY *v*. THE STATE.

1. EVIDENCE—PRACTICE.—If the defendant elicits from a witness an answer prejudicial to his interest, he is not entitled to have it excluded from the consideration of the jury.

2. MURDER—CHARGE OF THE COURT—RETREAT.—A person unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant, when the attack is such as produces a reasonable expectation or fear of death or some serious bodily injury; and in many cases it is the imperative duty of the trial court to so instruct the jury. Such an instruction, however, was unnecessary and would have been irrelevant in this case, inasmuch as the evidence adduced to show self defense affirmed that the defendant was in full retreat when he fired the fatal shot.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

Erasmus May, the appellant, was convicted of murder in the second degree, upon an indictment which charged him with the murder of D. Daffin, on July 3, 1884, by shooting him with a pistol. A term of seventy-five years in the penitentiary was the penalty assessed against appellant.

It was fully proved, and not controverted, that the deceased was shot and almost instantly killed at a hay camp, in Falls county, on the day alleged in the indictment. His father testified that deceased, at the time he was killed, was about twenty-one years old, well grown and stout, and weighed about one hundred and seventy-five pounds. Witness reached the hay camp an hour or two after the killing, and found the body of the deceased lying on his back, near the cook house, and about thirty feet from the tent. Deceased's right hand lay across his breast, with a knife lying loosely in it. It was a pocket knife, with a blade open and about three inches long. Witness saw no

blood on the knife. The body was not moved while witness remained. Of his own knowledge the witness could not say who killed his son. There was but one wound on the body. It was a gun shot wound, and the ball entered below the left nipple and passed directly through the body.

Doctor Whatley, for the State, testified that he was a brother-in-law of the deceased, and reached the latter's body after life was extinct. He noticed a knife in the deceased's hand, which was lying across his body. There was no blood on the knife. Witness believed that the deceased, if he had the knife in his hand at the time he was shot, would have dropped it instantly. Shot as he was, any man would have instantly dropped anything in his hands.

N. Stallworth, for the State, testified that he was a justice of the peace of Falls county, in 1884, and he was notified of the killing of the deceased on the morning it occurred. He summoned a jury of inquest and went to the scene of the homicide, reaching there about ten or eleven o'clock in the forenoon. A number of people were there, and among them were Frisby Henderson, Steve Blakeley and Alf. Nelson, but the defendant was not there. The body of the deceased lay upon the back, with one hand by his side and the other across his breast, with a knife, not grasped, but lying in it loosely between his fingers and body. The point of the knife was down, and was caught in a fold of deceased's shirt. Witness could not say whether the body had been moved, there were no marks indicating that it had, and he saw no blood except where it lay. There was but one wound on it, and that was where a ball had entered below the left nipple and passed straight through the body. Frisby Henderson, Steve Blakely and Alf. Nelson testified at the inquest. The proceedings at the inquest were handed to the district clerk by witness, and he had not seen them since, nor could he say where they were. There was no blood on the knife. The body lay about twenty feet from the tent, with the feet pointed diagonally towards the mouth of the tent. The wire cutter was thirty or forty feet from the tent, and the wagon about the same distance. A mesquite tree stood about five feet from the southeast corner of the tent, which was about eight or ten feet long by five or six in width. Frisby Henderson, Alf. Nelson and Steve Blakeley testified before the jury of inquest, and their statements were substantially the same, and favorable to the defendant. In effect, their testimony was that,

on the morning of the killing, the deceased (who was the fore-man of the party) came to the hay camp and told Alf. Nelson to go and catch the mules, which were grazing some distance away. Nelson started off, and deceased ordered defendant to help Nel-son catch the mules. Defendant tried to find a rope, but could find none, and so told the deceased, who immediately said to the defendant: "You G—d d—d son of a bitch, I'll make you make a rope," and ran to the wagon and assaulted the defendant with a knife, cutting the defendant's shirt in two places before defendant could get out of his reach. Defendant then ran around the tent, the deceased pursuing and cutting at him with his knife; and, as the defendant ran by the tent, he snatched a pistol from the tent, and while in a stooping position pointed the pistol around his left arm, without rising to an erect position, and fired back as he ran, the ball taking effect in the body of the deceased. The deceased then stopped, stepped back a few steps and sat down, lay back and died in about ten minutes. Steve Blakeley, after saddling a horse, left camp to go for Mr. Mark Harwell, for whom the deceased and the others were cut-ting hay. The jury of inquest returned a verdict of justifiable homicide, and no warrant was then issued for the defendant A few days after the inquest the defendant voluntarily surren dered, and witness put him under a nominal bond to await the action of the grand jury. Defendant complied with the bond, but the next grand jury found no indictment against him. He had not left the county, so far as witness knew, but was out of the way when the inquest was held.

The next entry in the statement of facts recites that "some witness whose name is not given in the statement of facts testi-fied as follows," and then proceeds to set out the testimony, which bears internal evidence that it was the testimony of Frisby Henderson, given at the trial in which this conviction was had. The witness stated that he was cooking breakfast, and defend-ant and Alf Nelson were sitting down by the tent, when the de-ceased rode up and said, "Frisby, is breakfast done?" Witness told him it was. He said witness never had enough bread, and to cook more. He spoke to Nelson and said, "Alf, go and get up the mules; old Blue will be gone to h—ll in a minute." He then told defendant to go and help Alf get the mules. Alf went on and defendant still sat there, and said he had no rope. De-ceased rode to a tree and tied his horse, and then went to the wire cutter, some twenty steps southeast of the tent, and com-

menced cutting wire. Directly he again told the defendant to
go and help Alf get the mules. Defendant replied that he had
no rope, and that, by G—d, he didn't have to make one. De-
ceased then turned from the wire cutter, and, walking towards
defendant, said "You G—d d—d son of a bitch, I'll make you
make a rope." Deceased had nothing in his hand; witness was
standing where he could see. When deceased got in about ten
steps of defendant, the latter reached down under the northeast
corner of the tent and got Mr. Harwell's six shooter pistol, which
was kept at the camp, and he leveled it at the deceased. De-
ceased stopped, and he and defendant looked at each other some
time, neither of them speaking, when the defendant fired, and
deceased turned and walked back and a little past where wit-
ness was standing, and then lay down on his back. Defendant
with his pistol followed the deceased, and said "O yes, G—d
d—n you, I've got you." He walked up to deceased with the
pistol in his hand, and the deceased said, "don't shoot me any
more." The defendant did not try to shoot any more, but stood
there until the deceased died, and then put his hand into de-
ceased's pocket, took out deceased's knife, opened it, and cut his
own shirt in two places crosswise. Deceased had one of his legs
drawn up, and was left in that position by the defendant. After
defendant cut his own shirt, which was a very close fitting white
knit undershirt, he and Steve Blakeley stepped aside and had a
talk which the witness could not hear. Then the defendant
saddled the pony which was worked to the hay rake, and rode
off toward's Gassoway's pasture. After he had gone, Steve
Blakeley came to witness and Alf Nelson, and told them what
statement they must make about the killing. The witness then
proceeded to give the statement which Blakeley said must be
given. In substance it was the same as the version given by
the previous witness, Stallworth, of the testimony of Blakeley,
Henderson and Nelson at the inquest held over the body of the de-
ceased. Blakeley told the witness and Nelson that nobody would
know any better, and that, if they would swear to that state-
ment before the inquest, the jury would clear the defendant.
Witness agreed to make the statement, and he swore to it before
the jury of inquest, and once before the grand jury. He was
afraid not to swear to it; he was afraid of the defendant. He
was afraid the defendant would kill him like he had killed the
deceased, if he did not swear it. When the defendant killed the
deceased, Alf Nelson was off after the mules, but he came up

pretty soon, and, while some distance off, he asked what was the matter. Witness told him that Erasmus May had shot Mr. Daffin. Nelson commenced hallooing and started to run off, but Blakeley called him and he then came up. Soon after the shooting, Blakeley got on the deceased's horse and went after Mr. Harwell. In January, 1886, witness was attached and brought before the grand jury. Mr. J. W. Perkins, the foreman, who was also the foreman of a previous grand jury to which witness had made the first statement about the killing, again inquired of witness about it. Witness began to tell him the same tale he had sworn to at the inquest and before the first grand jury, but he stopped witness and said, "Frisby, we have now found out enough about this matter to know that you are lying, and so you had better tell us the truth about it." Witness still refused to tell anything except what he had previously told. It was then about dinner time, and the foreman sent the witness to jail, and he was kept in jail until the grand jury met after dinner, when he was again brought before them, and the foreman told him he wanted the truth, and that if witness would tell the whole truth about the killing he should not be prosecuted and would be protected. Witness then commenced and told substantially what he has testified at this trial. He was then placed in the charge of the sheriff until the defendant could be arrested. What the witness has sworn to at this trial is the truth, and his reason for previously swearing differently was because he was afraid of violence from the parties concerned. Witness had never talked to the defendant about this matter. Steve Blakeley is in the penitentiary.

Cross examined, the witness stated that last winter he had a difficulty with defendant at a festival, about a bet they had made on a cake made by some of the girls, but they settled it without a fuss. Witness did not tell Alf. Nelson and his wife, just before the defendant was indicted, that he could fix defendant, as the white folks would believe anything he might say, because the defendant had killed a white man. [Deceased, it appears, was the only white man in the hay cutting party.]

Hugh Barrett, for the State, testified that he was a member of the coroner's jury which investigated the cause of the deceased's death. The jury of inquest did not make a close examination of the ground, nor make any measurements. They exonerated the defendant on the testimony of the three negroes, Henderson,

Nelson and Blakeley, which has already been stated in Stallworth's testimony.

Alf. Nelson, for the State, testified that he went for the mules when told by the deceased to do so, and he got them across a ridge and out of sight of the hay camp, when he heard a pistol fire and went up on the hill to see what was the matter. Just as he got in sight Frisby Henderson hallooed to him, saying that the defendant had shot the deceased. This frightened witness, and he commenced to halloo, and ran towards home, when Steve Blakeley hallooed to him, and he stopped, and then turned around and went towards the camp. Deceased was sitting on the ground, but soon lay back and died. Witness saw no one go up to the deceased, and did not see the defendant get the deceased's knife out of his pocket. When witness, after he started back, first saw the defendant, the latter was saddling the rake horse, which he afterwards rode off. Witness heard only one shot. Witness did not go nearer than fifteen or twenty feet of the body, and defendant had then ridden away. Steve Blakeley took the witness and Frisby Henderson off to one side, and told them what they had to swear. At first the witness declined to swear to it, and Blakeley threatened him if he did not, and said that nobody would ever know the difference. He said that if witness did not swear what he told him, he, the witness, would be apt to come up with "bell off." Witness was scared and agreed to swear it. Witness gave the substance of what he was required to swear, as the same in detail has already been set out in Stallworth's testimony, and as he did testify before the coroner's jury. Defendant was not under arrest at that time. Witness was now telling truthfully all he knew about the killing. Of his own personal knowledge he could not say who fired the fatal shot, and all he knew about the shooting was what he was told by Blakeley and Henderson. Witness was still under indictment as an accessory to the murder of the deceased. At the festival where the defendant and Frisby Henderson came near fighting, witness was present. Both of them wanted to fight; Frisby did not seem afraid of the defendant. In January, 1886, Frisby was at witness's house when the defendant passed along the road, and Frisby said that defendant "had better look out," as he could "fix him" when he got ready, for the white folks would believe anything he would say about the defendant, because he had killed a white man.

Nelson Denson, for the State, testified that he saw defendant

on the streets of Marlin a few days after the killing, and heard him talking about it. Defendant was wearing a white knit undershirt which he said he had on the day he killed Mr. Daffin. Defendant then told witness that the deceased was cutting at him with a knife when he shot him; that he was running from deceased, and as he passed the tent he jerked up his pistol and fired back over or around his shoulder at the deceased, and the deceased fell. He said he had to kill the deceased to save his own life. He then showed to witness the places where his shirt was cut. Witness noticed them closely. One was in the side and the other across the back, and both ran crossways of the body. The shirt fit the defendant very closely, and witness looked for cuts in his skin, but could not see where the skin was even grazed. In the witness's opinion, the shirt could not have been cut while on the defendant, as he represented, without cutting the skin, as it fit so close.

After the State closed, the defense introduced in evidence an indictment presented at the January term, 1886, which charged that Alf. Nelson, one of the State's witnesses, unlawfully, knowingly and willfully did aid Erasmus May, the defendant, to evade arrest and trial for the murder of the deceased, Daffin, etc.; wherefore the said Nelson was an accessory to said murder etc.

B. G. Shields, for the defense, testified that a day or two after Daffin was killed, the defendant, accompanied by Mr. Mark Harwell, came to witness's house, looking for constable Hall, for the purpose, as he stated, of surrendering to him. Witness then heard of the cuts in defendant's shirt, but he was old and almost blind, and did not see the cuts.

Mark Harwell, for the defense, testified that he knew of the surrender of defendant to Constable Hall, several days after the killing. Witness did not know where defendant had been since the killing and down to that time. All the hands at the hay camp were in the witness's employ, and the deceased was foreman. Blakely came and told witness of the killing, the morning it occurred, and witness hurried to the camp. He found the deceased lying as already described. Defendant and the rake horse were gone. The pistol with which the killing was done belonged to witness; the hands had borrowed it to keep at the camp. Deceased did not stay at the camp the night before the killing; he stayed at his home, and left early the next morning to look after his work. The next thing known of him by witness, he was dead. When witness reached the camp, the negroes

there had gone to work and the deceased was lying where the witness supposed he was killed.

*Wm. Shelton*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE.    Appellant prosecutes this appeal from a judgment of conviction for the offense of murder of the second degree, confinement in the State penitentiary for the term of seventy-five years being assessed by the verdict.

By a bill of exceptions and explanation thereto by the judge, it appears that, in answer to a question by appellant's counsel, a witness testified that defendant stated to him that deceased had cut his shirt in two places on the side, showing the cuts, and the witness further testified that in his opinion the cuts could not have been made without cutting the body of the defendant.    On the next morning counsel for defendant moved to exclude this portion of the evidence with regard to the opinion of the witness.    This motion was refused and exception was taken thereto.    In this there was no error.    If the opinion of the witness was responsive to a question from defendant, he will not be permitted to speculate as to what the answer will be, and, if against his interest, have the answer excluded.

In justification of the killing, appellant relied upon self defense.    The evidence in support of this defense is substantially as follows:    Early of the morning of the homicide, Daffin (deceased) came to the hay tent, the parties being all engaged in hay making.    As soon as he arrived at the tent, he ordered Alf Nelson to go and catch the mules, which were grazing some distance away.    Nelson had started off, when deceased ordered May (appellant) to go and help Nelson catch the mules.    Their failure to find a rope so infuriated deceased that he immediately said to May:    "You G—d d—d s—n of a b—h, I'll make you make a rope," and ran to the wagon and assaulted May with a knife, cutting his shirt in two places before he could get out of his reach.    May fled around the tent, Daffin pursuing and cutting at him with his knife.    As May ran by the tent, he snatched a pistol from the side of the tent, and, while in a stooping position, he presented the pistol around his left arm, without rising, and fired back as he ran.    The ball took effect in the body of

deceased, causing him to stop, step back a few steps, and sit down.    Death ensued in about ten minutes.

Appellant requested the court to instruct the jury that he was not bound to retreat, etc.   This was refused, and this ruling is assigned as error.   While the law, under no circumstances, requires the party assaulted to retreat, and in very many cases it is the imperative duty of the court to so instruct, yet in some cases it is not necessary, and in these the refusal is not error. It is the duty of the court to charge the law applicable to the facts of the case, and there is no fact in this case requiring a charge upon the subject of retreating.   For, if the jury believed the witnesses who make the case of self defense, evidently appellant was retreating at the very instant he fired the fatal shot; and, if the law required him to retreat, he was, according to the testimony of these witnesses, in full and perfect compliance with the law.   In cases in which there is no retreat, it might be beneficial to a defendant to have an instruction given that he is not required to retreat; but when he has retreated, no possible benefit can accrue to him from such instruction.   In fact, where the proof is evident (as in this case, if appellant's witnesses are to be credited) that the accused did retreat, and was in full retreat when he fired, a charge that the law does not require him to retreat would not be pertinent to any issue in the case, and there would be no legitimate purpose which such a charge could subserve.

The other assignments of error are not deemed well taken. No error appearing in the record, the judgment is affirmed.

*Affirmed.*